UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DAVID H. BROOKS,

                         Plaintiff,                **MEMORANDUM AND ORDER**

       -against-                      12-CV-4740 (SLT)(CLP)

MICHAEL SPOSATO, *et al.*,

                         Defendants.
-------------------------------------------------------x
**TOWNES, United States District Judge:**

In June 2012, plaintiff David H. Brooks ("Plaintiff"), who was detained in the Nassau

County Correctional Center (the "NCCC") and the Queens Private Detention Facility (the

"QPDF") prior to, and during, his criminal trial before Judge Seybert, commenced this action

against Deputy United States Marshals Timothy Hogan, Richard Viets, and John Quaranto

(collectively, "Defendants"); Michael Sposato, the Warden of the NCCC; William Zerillo, the

Warden of the QPDF; and various corporations and individuals—both named and

unnamed—affiliated with the NCCC, the QPDF, or the United States Marshals Service.

Plaintiff's pleading (the "Complaint") contains only one cause of action against Defendants,

alleging that they and others violated Plaintiff's Eighth Amendment rights through their

deliberate indifference to Plaintiff's serious medical needs. Defendants now move to dismiss

this Eighth Amendment claim on various grounds, arguing, *inter alia*, that the Complaint fails to

allege that they were personally involved in any constitutional violations. For the reasons set

forth below, Defendants' motion is granted and Plaintiff's claims against Defendants are

dismissed without prejudice to Plaintiff seeking permission to amend the Complaint to

substitute Defendants for Doe defendants if discovery establishes that Defendants were personally involved in a constitutional violation.

## BACKGROUND

Except as otherwise indicated, the following facts are drawn from the Complaint, the allegations of which are assumed to be true for purposes of this memorandum and order. At all times relevant to the Complaint, Plaintiff has been "profoundly psychologically impaired," suffering from psychological disorders including Bi-Polar Disorder, Panic Disorder with Agoraphobia, Obsessive Compulsive Disorder, Post-Traumatic Stress Disorder, Asperger's Disorder and Paranoid Personality Disorder (¶ 14).[1] Throughout his adult life, he has been under the care of "highly qualified and credentialed psychiatrists," who have prescribed medications to help Plaintiff cope with these disorders (¶ 15). Among the medications which Plaintiff was taking at the time of his incarceration was Ativan, a benzodiazepine (¶ 15).

Although it is not specifically alleged in the Complaint, the Court will take judicial notice of the fact that on or before October 24, 2007, Plaintiff and others were indicted for securities fraud and other offenses in connection with the operation of a corporation which allegedly sold body armor. *See United States v. Brooks*, No. 06-CR-550 (JS), Docket Entry 51. On October 24, 2007, plaintiff was arrested on these charges and taken to the NCCC, a county jail which houses federal detainees pursuant to an "Intergovernmental Service Agreement" between the United States Marshals Service and the NCCC (¶¶ 2, 19). The following day, Plaintiff appeared in the federal courthouse in Central Islip, New York, for an initial detention hearing (¶ 20). At the hearing, Plaintiff's counsel advised the court of Plaintiff's health issues,

---

[1]Numbers in parentheses, preceded by "¶," denote pages in the Complaint.

identified Plaintiff's treating physician, and noted that Plaintiff had been prescribed "very high doses of Ativan" (¶ 21). The jurist presiding over the hearing allegedly instructed the Assistant United States Attorney and the Deputy United States Marshals who were present in court to "make sure that the NCCC made available to Plaintiff 'whatever medication' he needs" (¶ 21).

A second bail hearing was conducted on October 30, 2007 (¶ 22). In anticipation of that hearing, Plaintiff's treating physician provided the court with Plaintiff's medical history (¶ 23). That history stated that Plaintiff was receiving high doses of Ativan, which had ameliorated Plaintiff's symptoms; emphasized the need to closely monitor Plaintiff's medication in light of his "altered environment," and warned that abruptly discontinuing Ativan could result in "life threatening grand mal seizures" (¶ 23). Following the hearing, Plaintiff remained incarcerated at NCCC until he was released on bail on January 3, 2008. Throughout this period of incarceration, Plaintiff received Klonopin, another benzodiazepine, and apparently suffered no ill effects (¶ 25).

The problems which give rise to this lawsuit began on January 14, 2010—a few days prior to the start of Plaintiff's criminal trial—after Plaintiff was re-arrested for violating the conditions of his release (¶ 27). Immediately following his arrest, Plaintiff suffered a "serious panic attack" which necessitated treatment at an emergency room (¶ 27). Plaintiff was treated with Ativan, administered orally in the form of three, two-milligram pills (¶ 27).

Following his release from the hospital, Plaintiff was transported to the NCCC (¶ 27). There, Plaintiff was evaluated by a clinical psychologist, who diagnosed Plaintiff with panic disorder and anxiety disorder, noted that Plaintiff was receiving psychopharmaceutical medications prescribed by a private mental health physician, and noted that Plaintiff did not

3

have a history of substance abuse (¶ 28). Despite the psychologist's diagnosis, defendant Perry Intal, a Nurse Practitioner employed by defendant Nassau Health Care Corporation ("NHCC")—a public benefit corporation which provides healthcare to NCCC inmates—directed that Plaintiff be placed on a "detox" protocol (¶¶ 4-5, 29). Thereafter, Plaintiff was not only deprived of Ativan, but placed in solitary confinement (¶ 30).

On January 15, 2010, Plaintiff appeared in court, where his attorney advised Judge Seybert of Plaintiff's panic attack and subsequent treatment in the emergency room (¶ 31). The judge "explicitly instructed that Plaintiff be allowed to take his medication" (¶ 31). However, Plaintiff was apparently not provided with any Ativan that evening (¶ 31).

On January 16, 2010, Plaintiff allegedly appeared in Court yet again (¶ 32). The Court, having received a letter from Plaintiff's treating physician warning that Plaintiff might suffer "life threatening convulsions" if he did not receive benzodiazepines, again ordered that Plaintiff "get his medications as soon as practicable" (¶ 32). Despite this order, Plaintiff did not receive the medication that evening or the next day, Saturday, January 17, 2010 (¶¶ 32-33).

On January 17, 2010, Plaintiff suffered a seizure at the NCCC (¶ 34). Nevertheless, Plaintiff did not receive any benzodiazepines until he appeared for jury selection on Monday, January 19, 2010, when Judge Seybert permitted Plaintiff to take Ativan in the courtroom (¶ 36). That same day, Plaintiff's treating physician wrote to a Nurse Edwards at the NCCC, stressing the importance of continuing Plaintiff's medication (¶ 36). However, Plaintiff was still not permitted to take any Ativan when he returned to the NCCC that evening (¶ 37).

On January 20, 2010, Judge Seybert again permitted Plaintiff to take Ativan in open court (¶ 38). The judge also issued an order to defendant Michael Sposato—then the Acting

4

Sheriff of Nassau County and the Warden of the NCCC—directing that he administer Ativan and another medication, Ambien, to Plaintiff (¶¶ 3, 28). Plaintiff's counsel delivered the medication to the Deputy United States Marshals who were in court that day (¶ 28).

On January 21, 2010, Plaintiff's counsel informed Judge Seybert that Plaintiff had not received any benzodiazepines the previous night, and that the medications provided to the Deputy United States Marshals had been "confiscated" (¶ 39). The judge "expressed ... concern" that Plaintiff might "go into convulsions in the absence of his medication" (¶ 39). The NCCC apparently did not share those concerns, and Plaintiff received no benzodiazepines whatsoever during the period from January 22 through 24, 2010, when there were no court proceedings in Plaintiff's case (¶ 40).

On January 27, 2010, personnel at the NCCC "discovered some Ativan on Plaintiff" (¶ 42). The Complaint does not specify the amount of Ativan discovered, but states that Plaintiff had "managed to squire [*sic*] away" medication "to take at night and on weekends, in a desperate attempt to avoid the life-threatening consequences of sudden withdrawal from benzodiazepines" (¶ 42). Although NCCC officials charged him with violating the facilities' rules (¶ 42), the Complaint does not allege what, if any, discipline Plaintiff received as a result of the violation. However, the pleading states that NCCC officials had Plaintiff transferred to the QPDF, a private prison operated by defendant GEO Group, Inc., on January 29, 2010 (¶ 42).

Plaintiff's benzodiazepine deprivation continued following his transfer to the QPDF (¶ 46). According to the Complaint, this deprivation was attributable to a decision by defendant Warden Zerillo; defendant Jason Maffia, the Supervising Health Services Administrator of the QPDF; and defendant Lyubov Gorelik, a staff psychiatrist at that facility (¶¶ 9-11; 53). These

three defendants allegedly "determined to, and did, not provide any benzodiazepine whatsoever to Plaintiff, instead putting him on a regimen of contra-indicated drugs ... (¶ 53).

On February 3, 2010, Warden Zerillo communicated his facility's decision to Defendants by sending them an email stating that continuing Ativan put Plaintiff at risk of a "major health episode" (¶ 61). Defendants delivered the email to Judge Seybert, who then ordered that Ativan no longer be made available to Plaintiff in the courtroom (¶ 62). Judge Seybert also directed Magistrate Judge Tomlinson to conduct a hearing regarding Plaintiff's medications and Plaintiff's ability to assist his attorneys in his defense in light of the change in his medications.

On February 13, 2010, Judge Tomlinson issued a report and recommendation (the "R&R") in which she recommended that Plaintiff either be provided with benzodiazepine or be weaned off the drug in a manner consistent with the Bureau of Prisons' protocols (¶ 74). That R&R was adopted in part by Judge Seybert's order dated February 16, 2010, which directed QPDF, Zerillo, Maffia and Gorelik to provide medication to Plaintiff as directed by his treating physician (¶ 75). However, on the very day that order was issued, Plaintiff suffered a panic attack and seizure so severe that QPDF issued a "Code Blue" to "assist" Plaintiff (¶ 84). According to the Complaint, "Plaintiff has been diagnosed with Post-Traumatic Stress Disorder as a result of this ... 'near death' experience" (¶ 89).

Despite Judge Seybert's February 16, 2010, order, "Plaintiff was not restored to a benzodiazepine protocol until on or about February 19, 2010" (¶ 90). By that time, Plaintiff's criminal trial had been ongoing for about one month (¶ 90). The trial continued for almost seven more months before the jury found plaintiff guilty of the crimes charged (¶ 90).

6

*The First Action*

In mid-April 2011, Plaintiff commenced an action in the United States District Court for the Southern District of New York (the "SDNY"). The complaint in that action (hereafter, the "First Action") named as defendants seven individuals—Sposato, Zerillo, Maffia, Gorelik, and the three Defendants—as well as 100 Does, alleged to be various employees of the NCCC, the QPDF, and the United States Marshals Service. The pleading principally advanced a claim pursuant to *Bivens v. Six Unknown Named Narcotics Agents*, 403 U.S. 388 (1971), alleging that the defendants had violated plaintiff's Eighth Amendment rights through their deliberate indifference to his serious medical needs. However, the complaint also included a second cause of action against Dr. Gorelik alone, alleging negligence and malpractice.

By order dated May 24, 2011, SDNY Judge Deborah A. Batts transferred the First Action to this Court, where it was docketed as *Brooks v. Sposato*, 11-CV-2598 (SLT)(CLP). Thereafter, Sposato, Zerillo, Maffia, and Gorelik answered the complaint. Defendants, however, requested and received permission to move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

On March 19, 2012—less than two hours after Defendants' fully briefed motion to dismiss was electronic filed with the Court—Plaintiff filed a "Notice of Dismissal Without Prejudice," dismissing his claims against Defendants without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). Plaintiff subsequently advised Magistrate Judge Cheryl L. Pollak that he wished to dismiss with prejudice his Eighth Amendment claims against Zerillo, Maffia, and Gorelik and to dismiss without prejudice his Eighth Amendment claim against Sposato and his medical malpractice claim against Gorelik. Letter to Magistrate Judge Pollak from Andrew J.

7

Goodman, Esq., dated Jan. 30, 2013, p. 1. On March 7, 2013, Judge Pollak issued a report and recommendation in which she recommended that the First Action be dismissed as Plaintiff requested in his January 30, 2013, letter. In an order dated September 23, 2014, the Court adopted Judge Pollak's recommendation, dismissing Plaintiff's Eighth Amendment claims against Zerillo, Maffia, and Gorelik with prejudice and Plaintiff's Eighth Amendment claim against defendant Sposato and his medical malpractice/negligence claim against Gorelik without prejudice.

### The Instant Action

In June 2012—less than three months after dismissing his claims against Defendants without prejudice, but more than half a year before he requested that the First Action be dismissed in its entirety—Plaintiff commenced this action in the Supreme Court of the State of New York, Nassau County. The complaint—referred to as the "Complaint" herein—names the exact same defendants as the First Action, along with four others: NHCC; Perry Intal; GEO Group, Inc. ("GEO Group"), which owned and operated the QPDF; and GEO Care, Inc., a wholly owned subsidiary of GEO Group which allegedly provided healthcare services at QPDF. The Complaint contains three causes of action, the first two of which resemble the causes of action raised in the First Action. Although the Complaint does not mention *Bivens*, the first cause of action alleges that Sposato, Intal, Defendants and the Doe defendants were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment. The second cause of action alleges that Intal and his employer, NHCC, and Gorelik and her employers, GEO Group and GEO Care, Inc., committed medical malpractice or were otherwise negligent. In the third cause of action, the Complaint alleges that Sposato acted "recklessly," and that Zerillo,

8

Maffia, Gorelik, and their employers, GEO Group and GEO Care, Inc., intentionally inflicted "as much personal physical and emotional damage on Plaintiff as possible" because they erroneously believed that "Plaintiff was 'charged' with selling 'bogus' body armor" (¶ 105).

The Complaint contains only two explicit references to Defendants. The first, in paragraph 12, merely alleges that Defendants were "Deputy United States Marshals assigned to the office of the United States Marshals in Islip, County of Suffolk, State and Eastern District of New York," and that they had unspecified "responsibility for working on matters related to Plaintiff." The second, in paragraph 61, alleges that Zerillo sent Defendants an email on February 3, 2010, stating that continued Ativan use posed dangers to Plaintiff, and that Defendants delivered this email to Judge Seybert (¶ 61). As noted above, this email allegedly prompted Judge Seybert to deny Plaintiff access to Ativan in her courtroom, which left Plaintiff entirely without benzodiazepines from February 3 through February 16, 2010 (¶¶ 62, 77).

To be sure, the Complaint contains several allegations relating to unspecified Deputy United States Marshals who were present in court during various proceedings relating to plaintiff's criminal case. First, the Complaint alleges that two Deputy United States Marshals were present at the initial detention hearing on October 25, 2007, and were instructed "to make sure that the NCCC made available to Plaintiff 'whatever medication' he needs" (¶ 21). The Complaint also alleges that Deputy United States Marshals were present at the bail hearing on October 30, 2007 (¶ 22). However, the Complaint does not attribute to these Deputy Marshals any acts or omissions that might give rise to liability.

Second, the Complaint alleges that Deputy Marshals were present in court on January 15, 2010, when the judge "explicitly instructed that Plaintiff be allowed to take his medication," and

9

on January 16, 2010, when the judge "said that Plaintiff should get his medications as soon as practicable" (¶¶ 31-32). The Complaint alleges, upon information and belief, that the Deputy Marshals did not communicate the Court's "directive to the NCCC and/or the NCCC personnel failed and refused to abide by this directive" (¶¶ 31-32). However, the Complaint also alleges that Intal placed Plaintiff on a "detox" protocol when he arrived at the NCCC on January 14, 2010 (¶ 29), implying that the Deputy Marshals' failure to communicate with the NCCC was not the cause of Plaintiff's failure to receive his medication.

Third, the Complaint alleges that Deputy United States Marshals were in court on January 19 and 20, 2010, when Judge Seybert permitted Plaintiff to take Ativan in the courtroom (¶¶ 36, 38). On the latter date, the judge issued an order directing NCCC Warden Sposato to administer Ativan and Ambien to Plaintiff and the medication was given to the Deputy Marshals (¶ 38). The pleading alleges that Plaintiff did not receive the medication because one or all of the following three things occurred: (1) the Marshals did not inform the NCCC of the court's order; (2) the Marshals failed to deliver the medication to the NCCC; and/or (3) NCCC personnel failed and refused to abide by the court's order (id.).

Fourth, the Complaint alleges that Deputy United States Marshals were in court on January 21, 2010, when Plaintiff's counsel advised Judge Seybert that the Ativan which had been given to the Deputy Marshals the day before had been "confiscated" (¶ 39). The judge expressed her concerns that Plaintiff might "go into convulsions" unless he received his medication (¶ 39). The pleading alleges, upon information and belief, that the Deputy Marshals failed to inform the NCCC of the judge's concerns and/or that the NCCC disregarded those

10

concerns (¶ 39). However, the Complaint also states that "the Court learned that ... NCCC had

intentionally withheld benzodiazepines ... in order to have [Plaintiff] 'detoxed ...'" (¶ 41).

Although the Complaint contains these references to Deputy United States Marshals, the

pleading does not allege that Defendants were among the Deputy Marshals who were present in

court on October 25 or 30, 2007, or on January 15-16 or 19-21, 2010. To the contrary, the

pleading repeatedly states that the identity of these Deputy Marshals is "presently unknown to

Plaintiff" (¶¶ 21, 22, 31, 32, 36, 38, 39, 41).

### *The Instant Motion to Dismiss*

Defendants now move to dismiss the claims against them pursuant to Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure. The Memorandum of Law in Support of

Defendant's Motion ("Defendants' Memo") raises three arguments. First, noting that they are

alleged only to have passed a message from defendant Zerillo to Judge Seybert, Defendants

argue that they were not personally involved in a violation of Plaintiff's constitutional rights.

Second, Defendants argue that, even if their alleged actions constituted a violation of Plaintiff's

constitutional rights, they are entitled to qualified immunity because they did not violate "clearly

established statutory or constitutional rights of which a reasonable person would have known"

(Defendants' Memo, p. 12 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). Third,

Defendants argue that, to the extent that they are being sued in their official capacities, those

official-capacity claims should be dismissed for lack of subject-matter jurisdiction because the

United States has not waived its sovereign immunity with respect to those claims.

Along with Defendants' Memo, Defendants have filed an affidavit from Debora J. Hearn,

a Supervisory Deputy United States Marshal assigned to Central Islip Sub-Office (the "Hearn

11

Affidavit"). The Hearn Affidavit states that it is the practice of the Central Islip Sub-Office to assign at least two Deputy Marshals to a courtroom in which proceedings involving a custodial defendant are being conducted (Hearn Affidavit, ¶ 5). During January and February 2010, up to seven Deputy Marshals were assigned to the Central Islip Sub-Office, with another three rotating through from the Brooklyn office (*id.*, ¶ 6). However, according to Hearn, it was a "common practice" for deputies to relieve one another during the day, and not a practice of the office to keep logs indicating precisely which deputies were in a particular courtroom at a specific time (*id.*, ¶¶ 7-8).

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiff's Opposition") contains five arguments. Plaintiff's first argument implies that his Eighth Amendment claims against Defendants rest on the theory that Defendants are the Deputy Marshals who were present in the courtroom on October 25 and 30, 2007, and on January 15, 16, 19, 20 and 21, 2010. Plaintiff's Opposition asserts that Plaintiff has "valid reason to conclude" that Defendants were in the courtroom on October 25, 2007, when Judge Seybert told the Deputy Marshals and the prosecutor to "make sure that the NCCC made available to Plaintiff 'whatever medications' he need[ed]" (Plaintiff's Opposition, p. 4). In addition, Plaintiff's Opposition "maintains" that the Deputy United States Marshals who were present in court on January 20, 2010, "were indeed the named ... Defendants" (*id.*). However, Plaintiff concedes that he "cannot state with certainty the exact Marshal Defendants that were present each day in the courtroom" (*id.*). Plaintiff suggest that his inability to identify the specific Deputy Marshals who were present is of no moment because "[t]his is an action based in tort and upon the doctrine of *res ipsa loquitor*" (*id.*, p. 2).

In his second argument, Plaintiff clarifies that he is not alleging that Defendants violated his constitutional rights by delivering Zerillo's email to Judge Seybert. Specifically, in addressing Defendants' qualified immunity argument, Plaintiff's Opposition states:

> Defendants claim they are immune from suit because they were exercising their conduct—delivering an email to Judge Seybert—and did not act in a manner that violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, Plaintiff does not allege this act of the ... Defendants[ ] as [*sic*] the one that violates Plaintiff's constitutional rights. This fact is completely irrelevant to this litigation. Rather, Plaintiff alleges that ... Defendants[ ] were instructed by the Court on January 15, 16, 20, and 21 of 2010 to provide Plaintiff with his medication, but failed to do so at any time thereafter (*id.*, p. 6).

Plaintiff's third argument, which addresses Defendants' third argument, "concedes that the United States must waive sovereign immunity with respect to constitutional tort claims against federal employees sued in their official capacities" (*id.*, p. 7). The third argument then states that "Plaintiff's claims against ... Defendants, in their individual capacities, are not subject to sovereign immunity" (*id.*). This implies that Plaintiff is suing Defendants solely in their individual capacities, and not in their official capacities.

Plaintiff's fourth and fifth arguments relate to a motion for summary judgment—a motion Defendants are not making. In his fourth argument, Plaintiff asserts that "there exist several material questions of fact left to determine," and lists various questions which "must be determined before Defendant[s] ... may ... be dismissed from the instant action." *Id.*, p. 7. In the fifth argument, Plaintiff asserts that Defendants' motion "must be denied for lack of a sworn statement by any individual with personal knowledge." *Id.*, p. 8.

13

In addition to Plaintiff's Opposition, Plaintiff has filed an affidavit executed by Plaintiff on November 7, 2013 ("Plaintiff's Affidavit"). That affidavit essentially attests to the truth of many of the allegations of the Complaint.

## DISCUSSION

### *Legal Standard*

Defendants move to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. However, Rule 12(b)(1) is applicable only to Defendants' third argument, which asserts that this Court lacks subject-matter jurisdiction over claims brought against Defendants in their official capacity because the United States has not waived its sovereign immunity. Since Plaintiff's Opposition implies that Plaintiff is suing Defendants only in their individual capacities, there is no need to consider Defendants' third argument or to discuss the legal standard governing motions pursuant to Rule 12(b)(1).

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If a party has not "nudged [her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*

14

When considering a Rule 12(b)(6) motion, materials outside the pleadings are "generally not considered ... unless the court treats [the motion] as one for summary judgment, giving all the parties a reasonable opportunity to present relevant evidence under Rule 56." *Nicholls v. Brookdale Univ. Hosp. Med. Ctr.*, No. 03-CV-6233 (JBW), 2004 WL 1533831, at *2 (E.D.N.Y. July 9, 2004). Aside from the allegations in the complaint, which are assumed to be true, a court can consider only "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). If matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment and all parties must be given a reasonable opportunity to present material pertinent to the motion. Fed. R. Civ. P. 12(d).

In this case, both Defendants and Plaintiff have submitted affidavits along with their memoranda of law. The arguments contained in the memoranda, however, do not rely on the facts set forth in those affidavits. Accordingly, the affidavits will not be considered by the Court in deciding Defendants' motion and there is no need to convert their motion to dismiss into a motion for summary judgment. The Court also will not consider Plaintiff's fourth or fifth arguments, which are irrelevant to a motion to dismiss.

### *Personal Involvement in Constitutional Violations*

Although the Complaint—unlike the complaint in the First Action—does not explicitly mention *Bivens*, Plaintiff's first cause of action (and the only cause of action alleging claims against Defendants) appears to advance a *Bivens* claim. "*Bivens* established that the victims of

15

a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980). Because implied causes of action of the sort recognized in *Bivens* are "disfavored," the Supreme Court "has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants'" and *Bivens* does not provide a remedy for all types of constitutional violations. *Iqbal*, 556 U.S. at 675 (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). Nonetheless, it is clear that *Bivens* permits the recovery of money damages from federal employees who are sued in their individual capacity for violations of the Eighth Amendment, as are the Defendants in this case. *See Carlson*, 446 U.S. at 17-18.

"[A] *Bivens* action is the federal analog to suits brought against state officials under ... 42 U.S.C. § 1983." *Hartman v. Moore*, 547 U.S. 250, 254, n. 2 (2006). Liability under § 1983 cannot be based on *respondeat superior* or on "linkage in the ... chain of command." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Similarly, under *Bivens*, "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*

In this case, Defendants are mentioned in only two paragraphs of the Complaint. Paragraph 12 alleges that Defendants were "Deputy United States Marshals assigned to the office of the United States Marshals in Islip, County of Suffolk, State and Eastern District of New York," who had unspecified "responsibility for working on matters related to Plaintiff." Paragraph 61 alleges that Zerillo sent Defendants an email on February 3, 2010, stating that

16

continued Ativan use posed dangers to Plaintiff, and that Defendants delivered Zerillo's email to Judge Seybert. However, neither of these paragraphs allege acts or omissions which might even arguably violate the Eighth Amendment or any other constitutional provision. Indeed, Plaintiff's Opposition clarifies that Plaintiff is not even arguing that the act of delivering Zerillo's email to the judge violated his constitutional rights. *See* Plaintiff's Opposition, p. 6 ("Plaintiff does not allege this act of the ... Defendants[ ] [i.e., delivering the email] as [*sic*] the one that violates Plaintiff's constitutional rights."). Accordingly, the Complaint currently fails to state a claim against any of the Defendants.

While the Complaint contains several other paragraphs which allege acts or omissions by "Deputy United States Marshals," each of these paragraphs specifically states that the identity of these Deputy Marshals is "presently unknown to Plaintiff." *See* Complaint, ¶¶ 21, 22, 31, 32, 36, 38, 39, 41. Those allegations may be sufficient to state a claim against Doe employees of the United States Marshal Service, who are also named as defendants in the Complaint's first cause of action. They do not make out a claim against Defendants.

Plaintiff's Opposition asserts that Plaintiff now has "valid reason to conclude" that Defendants were the Deputy United States Marshals who were present in the courtroom on October 25, 2007. Plaintiff's Opposition, p. 4. However, the Complaint does not suggest any basis for liability against the Deputy Marshals who were present on October 25, 2007. Indeed, the Complaint alleges that Plaintiff "received the benzodiazepine Klonopin" at NCCC "[d]uring [the] entire time" between his arrest on October 24, 2007, and his release from custody on January 3, 2008. Complaint, ¶ 25.

17

Plaintiff's Opposition also asserts that the Deputy United States Marshals who were present in court on January 20, 2010, "were indeed the named ... Defendants." *Id.*, p. 4. However, it is unclear whether Plaintiff has a reasonable basis for this assertion or for alleging a constitutional violation on the part of these individuals. While the Complaint alleges "[u]pon information and belief" that these Deputy Marshals "did not inform NCCC of the Court's Order" that Sposato administer Ativan and Ambien to Plaintiff and "did not deliver the medication to the NCCC," it also alleges that "NCCC personnel failed and refused to abide by" the Court's Order and "failed and refused to administer this medication to Plaintiff." Complaint, ¶ 38. These contradictory assertions suggest that Plaintiff is merely speculating as to why he did not receive the medication.

Indeed, elsewhere in the Complaint, Plaintiff specifically alleges that NCCC personnel made a conscious decision to deny Plaintiff the benzodiazepines. The Complaint states that defendant Intal placed Plaintiff on a "'detox' protocol" on or about January 14, 2010, when Plaintiff first arrived at NCCC. *Id.*, ¶ 29. As a result, the Ativan given to the Marshals on January 20, 2010, was, in the words of Plaintiff's counsel, "confiscated." *Id.*, ¶ 39. According to the Complaint, the Court eventually learned that it was NCCC that "intentionally withheld benzodiazepines" from Plaintiff "in order to have him 'detoxed.'" *Id.*, ¶ 41.

In light of these allegations, it is unclear whether Plaintiff could currently amend his Complaint to state a claim against Defendants. This Court need not reach this question since Plaintiff's Opposition does not request permission to amend Plaintiff's pleadings. However, since there is a possibility that discovery may reveal that Defendants were among the Doe defendants named in the first cause of action and that Defendants violated Plaintiff's

18

constitutional rights, the Court will dismiss Plaintiff's claims against Defendants without prejudice to seeking permission to amend the pleading to renew the claims when and if Plaintiff determines that there is a reasonable factual basis for doing so.[2]

## CONCLUSION

For the reasons stated above, the motion to dismiss the claims against defendants Hogan, Viets and Quaranto for a failure to state a claim is granted. The claims against these defendants are dismissed without prejudice. If discovery reveals that Defendants were among the Doe defendants named in the first cause of action and that Defendants violated Plaintiff's constitutional rights, Plaintiff may seek permission to amend his pleading in accordance with the procedures set forth in paragraph III.A of the Court's Individual Motion Practices and Rules. *See* https://www.nyed.uscourts.gov/content/judge-sandra-l-townes.

**SO ORDERED.**

SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2015
Brooklyn, New York

---

[2]Since the Court is dismissing the claims against Defendants, the Court does not reach the question of whether Defendants are entitled to qualified immunity.

19